# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JEANNE LEMIRE, individually and on behalf of all others similarly situated, | 3:08-cv-00249 (CSH) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| WOLPOFF & ABRAMSON, LLP, | |
| Defendant. | |

HAIGHT, Senior District Judge:

Jeanne Lemire ("Lemire")[1] has sued Wolpoff & Ambranson, LLP ("Wolpoff") for violating Connecticut's regulatory requirements surrounding the collection of consumer debt. She alleges that Wolpoff's state-law violations have exposed it to liability under the federal Fair Debt Collection Practices Act ('FDCPA"), 15 U.S.C. §§ 1692 *et seq.* Lemire has moved under Federal Rule of Civil Procedure 23 to certify a class of all others similarly situated.

## I.     Factual Background

Wolpoff is a law firm based in Rockville, Maryland, that engages in collection of consumer debts. The basis of this lawsuit is Wolpoff's behavior with respect to consumers in Connecticut.

Under Connecticut law, businesses that engage in the collection of consumer debts must be licensed to do so. Conn. Gen. Stat. § 36a-801. Engaging in collection of consumer debts without a license constitutes a violation that may be punished by the Banking Commissioner, Conn. Gen. Stat. §§ 36a-50, -804, -806 to -808, and incurs liability that can be enforced by the state's attorney. *Id.* § 36a-810. The Connecticut General Assembly did not provide for a private

---

1.     Plaintiff's papers have inconsistently spelled Lemire's first name as "Jeanne" and "Jeannie." Until the Court is advised conclusively one way or the other, it will use the form that appears in the Complaint: "Jeanne."

right of action to target violations of this statute.  *See Gaetano v. Payco of Wis., Inc.*, 774 F. Supp. 1404, 1414 (D. Conn. 1990).

That is not the end of the analysis, however.  Under federal law, consumer debt collection agencies may not use "false, deceptive, or misleading representation[s]" or "unfair or unconscionable means" to collect debts.  15 U.S.C. §§ 1692e, 1692f.  "Without limiting the general application" of those broad prohibitions, *id.*, Congress gave specific examples of practices or representations which would violate those generalized prohibitions, including threatening "to take any action that cannot legally be taken or that is not intended to be taken," § 1692e(5),  and "[t]he use or distribution of any written communication . . . which creates a false impression as to its source, authorization, or approval."  § 1692e(9).

The theory that provides the foundation for Lemire's lawsuit is that Wolpoff's communication with consumers in Connecticut is a violation of Connecticut law, and that therefore it constitutes a *per se* violation of the FDCPA.

There is precedent for that argument, but the authority in this judicial district is not unanimous.  *Compare Gaetano*, 774 F. Supp. at 1415 & n. 8 (finding that the defendant violated the FDCPA "by failing to seek the proper license from the state banking commissioner, . . . [which] deprived the plaintiff of her right . . . to have the defendant's qualifications as a collection agency reviewed by state authorities" and "because the Court finds deceptive the defendant's attempt to collect a debt when prohibited from doing so by Connecticut law"), *with Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262, 271 3(D. Conn. 2005) (noting that "[n]ot all courts have adopted a categorical rule that an FDCPA violation occurs whenever an unlicensed debt collector sends out any debt collection notice," but examining the content of the debt

collection notices to find an FDCPA violation nevertheless).  Although the *Gaetano* Court found the mere "attempt to collect a debt when prohibited from doing so by Connecticut law" to be "deceptive," 774 F. Supp. at 1415, the *Goins* Court suggested that the illegality of such conduct under federal law might depend on the *content* of the communication, suggesting that a *per se* rule might be inappropriate.  352 F. Supp. 2d at 271.

## II.    Legal Standard

Under Rule 23(a) of the Federal Rules of Civil Procedure, a member of a class may sue or be sued as a representative of all members of a class only if *all* of the following conditions are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  These requirements are typically summarized as requirements of numerosity, commonality, typicality, and adequacy of representation.  *See, e.g.*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Furthermore, under Rule 23(b), at least one of the following three conditions must also obtain:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

The question of which 23(b) provision applies is relevant because, among other things, it determines whether class members may opt-out of the class.  *See* Fed. R. Civ. P. 23(c); *U.S. Trust Co. v. Alpert*, 163 F.R.D. 409, 419 (S.D.N.Y. 1995).  It is also well established that a class may be certified under more than one of the provisions in Rule 23(b).  And some circuits, including the Second Circuit, have instructed their courts to prioritize certification under Rule 23(b)(1) when available.[2]  *See Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir. 1977) ("[W]hen a class action may be certified under either (b)(1) or (b)(3), the former should be chosen when to do so will avoid the inconsistent adjudication or compromise of class interests that might

_____

2.   For that reason, and because Lemire did not originally seek certification under Rule 23(b)(1), I asked counsel to provide supplemental briefs on the issue of whether certification under that provision would be appropriate in this case.

otherwise occur."); *see also In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989); 5 Moore's Federal Practice § 23.40[3] & n.8 (3d ed. & Supp. 2008).

### A.    Numerosity

Wolpoff concedes "that the numerosity requirement has been satisfied."  Def.'s Mem. in Opp'n [doc. #26] at 2.

### B.    Commonality

The chief area of disagreement between Lemire and Wolpoff regards the amount of "commonality" between Lemire and other members of her putative class.  Lemire's proposed class is "*all Connecticut residents to whom Wolpoff, after closing its Connecticut office, sent a letter seeking to collect a consumer debt, which letter was not signed by a member of the Connecticut bar.*"  Compl. at 3 (emphasis added).

Wolpoff argues (1) that each letter needs to be analyzed individually to determine whether it contains actionable language, and (2) that because it sent some letters directly to consumers and some to their attorneys, those two kinds of letters are not sufficiently "common" to support Lemire's proposed definition for a putative class.

#### 1.    Content of the Letters

In *Gaetano*, the court identified several reasons why a collection agency acting in violation of Connecticut law might also violate the FDCPA.  One of those reasons was that the defendant in *Gaetano* had sent letters "demanding payment and stating that it intended to use all means at its disposal to collect and to enforce the debt (in other words, threatening to collect the debt)."  774 F. Supp. at 1414.  The *Gaetano* court found that such demands violated § 1692e(5) of the FDCPA "by threatening to take action that legally could not be taken."  *Id.* at 1415.

Wolpoff has latched onto this particular theory from *Gaetano* and assumed that Lemire will pursue *only* that theory to when arguing for the illegality of Wolpoff's actions.   For that reason, Wolpoff believes that "[e]ach of the letters sent by Wolpoff & Abramson must be analyzed individually," because the purpose of that individual analysis would be "to determine if the letter implies a threat to take action that [would be prohibited to] be taken in light of the fact that the Defendant law firm was not licensed as a collection agency in Connecticut."   Def.'s Mem. at 2-3.   Wolpoff also argues that "the letters are informative and do not threaten or imply that a law suit or further collection action of any kind will follow," *id.* at 5, and that "the least sophisticated debtor could only construe the letter as a prudential reminder, not as a threat to take action." *Id.* at 6.

However, by Wolpoff's own admission,

> most of the letters in this case state: 1) the identification of the party attempting to collect the debt; 2) an acknowledgement that the client alleges that a certain sum is owed; 3) a direction to contact the defendant if the debt is disputed; 4) an acknowledgement that no attorney in the Defendant's organization has personally reviewed the circumstances of the past due account; and 5) directions to pay the past due debt, if the person desires. [This] content of the letters . . . cannot be said to demonstrate an issue common to all purported class members . . . .

*Id.*

Wolpoff may turn out to be correct in arguing that some of these letters must have their individual content scrutinized, or in arguing that collection of debts in Connecticut does not give rise to *per se* liability under the FDCPA.   But Wolpoff is clearly wrong when it argues that "there is no common issue of law or fact present here." *Id.* at 7.   The common elements that Wolpoff itself admits clearly implicate the precise issue that Lemire raises: whether Wolpoff can legally collect consumer debts in Connecticut without a license, or whether such conduct is prohibited

by §§ 1692e or 1692f of the FDCPA.  Lemire is correct in her view that the "essential nature of the [class] claim . . . depends *not upon the contents of the letters but rather upon Wolpoff's failure to be licensed as a consumer collection agency . . . .*"  Pl.'s Reply Mem. [doc. #29] at 1.

In other words, the merits of Lemire's claim are for another day.  The question for today is whether the putative class shares that claim, based on the common content of Wolpoff's letters.  I conclude that it does.

### 2.    Letters Sent to Attorneys

"Some of the letters are addressed by Wolpoff & Abramson to attorneys for debtors while others are sent directly to the delinquent debtor."  Def.'s Mem. at 2.  Wolpoff argues that "letters to counsel cannot share a common fact pattern with letters sent to debtors," since it argues that individuals whose counsel received the letter, and who never read the letter themselves, would lack standing to raise the same claim brought by Lemire  *Id.*

Wolpoff cites Second Circuit precedent to suggest that letters sent to attorneys do not give rise a violation of the FDCPA.

> [W]e find serious flaws in [plaintiff's] argument that a violation of the FDCPA occurs where a party alleges that his attorney has been misled to the party's detriment.  Where an attorney is interposed as an intermediary between a debt collector and a consumer, we assume the attorney, rather than the FDCPA, will protect the consumer from a debt collector's fraudulent or harassing behavior.  However, this is not an issue on which we need to rule today.

*Kropelnicki v. Siegel*, 290 F.3d 118, 127-28 (2d Cir. 2002) (citation omitted).

While Wolpoff may be right that those letters present "a substantially different fact pattern," Def.'s Mem. at 5, that is not enough to destroy the commonality I have already found among those letters — namely, that they reflect an attempt to collect a debt in Connecticut, where the author of the letter was not licensed to do so.  The Second Circuit's observation in

*Kropelnicki* that attorneys can protect their clients from "fraudulent or harassing" behavior does not affect this conclusion, for two reasons. First, the claim that Lemire has raised need not be based on "fraudulent or harassing" behavior, since the statute also prohibits behavior which is merely "deceptive" or "unfair or unconscionable," and indeed, those were precisely the grounds on which this Court found FDCPA violations in *Gaetano*. 774 F. Supp. 1415 & n.8. Second, the Court of Appeals specifically disclaimed its own observation as *dicta*, saying it was "not an issue on which we need to rule today." 290 F.3d at 128.

Similarly, I am not troubled by Wolpoff's suggestion that class members whose letters had been received by their attorneys (and not by the putative debtors themselves) would lack standing to bring the same claims as Lemire. Def.'s Mem. at 2.

As an initial matter, this flies in the face of the legal convention that communications with a represented party's attorney are tantamount to communications with the party herself. But furthermore, in the context of this strict liability statute,[3] the Second Circuit does not require the consumer to demonstrate *damages* in order to have an "injury" that suffices to establish standing to sue under the FDCPA. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 307 (2d Cir. 2003) (holding that a plaintiff can show injury and establish standing for the purposes of an FDCPA claim "if he can show that [the defendant] *attempted* to collect money in violation of the FDCPA" (emphasis in original)).

Indeed, all that appears to be required to establish FDCPA liability is that the defendant "fails to comply" with any of the FDCPA's provisions "with respect to" the plaintiff. 15 U.S.C. §

---

3.    Courts in this judicial district have repeatedly characterized the FDCPA as a strict liability statute. *See, e.g.*, *Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 51 (D. Conn. 2000) (citing *Madonna v. Academy Collection Serv. Inc.*, No. 3:95-cv-00875 (AVC), 1997 WL 530101, *3 (D. Conn. Aug. 12, 1997)).

1692k(a).  It is evident that a communication with a consumer's attorney is still "with respect to" that consumer, and while the Second Circuit has not addressed this issue directly, it has spoken in *dicta* about the issue, noting with approval an *en banc* opinion from the Sixth Circuit that reached a similar conclusion.  *See Sibersky v. Goldstein*, 155 Fed. Appx. 10, 11, 2005 WL 2327235, *2 (2d Cir. Sept. 21, 2005) (remarking in *dicta* that even in cases where "only a 'consumer' has standing to sue," the "offending communication" could just as easily be sent to "someone standing in the consumer's shoes" (citing *Wright v. Finance Service of Norwalk, Inc.*, 22 F.3d 647, 649 n.1 (6th Cir. 1995) (en banc))).  While the Sixth Circuit was referring to the executor of a debt consumer's estate, I see no reason why a consumer's legal counsel would not stand "in the consumer's shoes."

Regardless, even if the letters to attorneys did present different claims that were not sufficiently common to support class certification, the analysis would not stop there.  That is because this problem could clearly and easily be solved by dividing the proposed class into two classes — one group of plaintiffs who had received letters directly, and one group whose attorneys received the letters.[4]

### C.    Typicality

The typicality element is distinct from commonality in that typicality focuses on "*claims or defenses*," rather than on "questions of law or fact."  Fed. R. Civ. P. 23(a) (emphasis added).

---

4.    If Lemire lacked standing to bring both of these kinds of claims, then her counsel might still be able to identify another prospective plaintiff who could be joined into the action and represent those plaintiffs.  But because I find that all the letters are sufficiently common without dividing up the class, there is no need to go down that path today.

Although Wolpoff argues that differences in facts (the lack of commonality) give rise to "different causes of action against the Defendant," Def.'s Mem. at 7, it does not venture to say what those additional claims may be, and it does not deny that all the members of the putative class share the one central cause of action for violation of the FDCPA.  Instead, Wolpoff merely asserts, in a conclusory fashion, that the different causes of action are "evident by virtue of the fact that the content of the letters are different for each purported class member," and that "the potential plaintiffs whose letters were sent to an attorney have different claims than those potential plaintiffs who received the correspondence directly."  *Id.* at 7, 8.

It is well established, however, that typicality does not require identical facts, and it is satisfied if the plaintiff's claim "arises from the same course of events as other class members, and plaintiff will be making the same legal arguments to prove liability."  *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 337 (D. Conn. 2000) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (citing standard, and noting that if same conduct is directed toward named plaintiff and putative class members, minor factual differences will not defeat typicality)); *see also Trief v. Dun & Bradstreet*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992) (claims need not be identical in order to be typical).

"Moreover, a difference in damages arising from a disparity in injuries among the plaintiff class does not preclude typicality."  *Duprey*, 191 F.R.D. at 337 (citing *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994)).

Bearing these various guideposts in mind, and in light of the fact that Wolpoff has failed to identify any unique "claims or defenses" beyond the arguments it has used against

commonality, I find that sufficient typicality exists among the putative class members that Lemire proposes.

### D.      Fair and Adequate Representation

In order to contest Lemire's ability to fairly and adequately represent the putative class, Wolpoff relies exclusively on its allegations that she is a "Professional Plaintiff," Def's Mem. at 8, and that this must necessarily imply that "the Plaintiff is . . . an opportunist seeking to usurp the rights of those individuals who are actually injured when a violation of the FDCPA occurs." Def.'s Mem. at 3.

Wolpoff brings to the Court's attention one other FDCPA lawsuit where Lemire is the plaintiff, 3:08-cv-00459 (CFO), and a class action where her spouse is the named plaintiff, *Lemire v. Hecker*, 3:07-cv-01696 (PCD). Wolpoff emphasizes that all three were "initiated with the help of the Consumer Law Group, LLP." Def.'s Mem. at 9.

While this accusation may be significant to Wolpoff, I am not convinced why it should be significant to this Court. In support of its proposition that professional plaintiffs are inadequate class representatives, Wolpoff cites only to an Sixth Circuit opinion where that court criticizes an FDCPA plaintiff for filing what it considered a meritless lawsuit.[5] Def.'s Mem. at 8 (quoting *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504 (6th Cir. 2007)). The Sixth Circuit, in turn, quotes extensively from an Eastern District of New York opinion that also took exception to FDCPA lawsuits, and in particular those lawsuits that the court perceived to be meritless:

> The interaction of the least sophisticated consumer standard with the presumption that the FDCPA imposes strict liability has led to a proliferation of litigation in this District. . . . The cottage industry that has emerged does not bring suits to remedy the "widespread

---

5.    That particular opinion concludes by noting that the plaintiff "has not been sanctioned for her suit and appeal only because [the defendant] did not so request."

> and serious national problem" of abuse that the Senate observed in
> adopting the legislation . . . .  Rather, the inescapable inference is
> that the judicially developed standards have enabled a class of
> professional plaintiffs.

*Jacobson v. Healthcare Fin. Servs., Inc*., 434 F. Supp. 2d 133, 138 (E.D.N.Y. 2006) (citations

omitted), *aff'd in part, rev'd in part, and vacated by* 516 F.3d 85, 96 (2d Cir. 2008).

On appeal, the Second Circuit did not remark on the district court's criticism of the

"cottage industry" surrounding FDCPA litigation.  What the Court of Appeals did do, however,

was reverse the district court's determination that this "professional plaintiff" had brought his

action "in bad faith and for the purpose of harassment."[6]

> In justifying the award [of attorneys' fees to the defendant],
> [the district court] relied on Jacobson's acknowledgment that the
> underlying debt was valid, and his admission that he did not feel
> "harassed, threatened or misled by the letter."  These facts are
> irrelevant to the question of whether Jacobson brought the action
> "in bad faith and for the purpose of harassment," and it was legally
> erroneous for the district court to base its conclusion on them. ***As
> explained above, by providing for statutory damages and
> attorneys fees for successful plaintiffs, the FDCPA permits and
> encourages parties who have suffered no loss to bring civil
> actions for statutory violations. Jacobson's subjective reaction to
> the letter, therefore, is neither here nor there.***
>
> The district court also based its award on the conclusion
> that Jacobson "knew that his claim was meritless."  Since we have
> found that Jacobson's third argument was in fact meritorious, this
> basis for granting costs and fees was necessarily erroneous.

*Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 96 (2d Cir. 2008) (citations omitted;

emphasis added).

---

6.    The district court relied upon its determination that the plaintiff had acted in bad faith in
order to award attorneys' fees and costs to the defendants in that case.  The FDCPA provides, in
pertinent part, the following: "On a finding by the court that an action under this section was
brought in bad faith and for the purpose of harassment, the court may award to the defendant
attorney's fees reasonable in relation to the work expended and costs."  15 U.S.C. § 1692k(a)(3).

Because the Second Circuit has repeatedly held that the FDCPA "encourages parties who have suffered no loss to bring civil actions for statutory violations," *id.*, I see no reason why a repeat plaintiff would be a worse representative of similarly situated persons. Indeed, the law requires me to verify that plaintiff's counsel is sufficiently experienced to prosecute the action without prejudicing the claims of the class members; if anything, Wolpoff's argument points toward establishing that necessary fact.

### E.     Any Element of Rule 23(b)

I have concluded that the four prerequisites of Rule 23(a) are satisfied, so I must now establish that "the putative class falls within any one of the three categories of Rule 23(b)." *Duprey*, 191 F.R.D. at 338. There are various reasons why a class may be certified under Rule 23(b), and two have possible application here.[7]

First, Rule 23(b)(1) will permit a class action if "prosecuting separate actions by or against individual class members would create a risk" of *either* inconsistent adjudications "that would establish incompatible standards of conduct for the party opposing the class," *or* "adjudications . . . that, as a practical matter, would be dispositive of the interests of other members . . . or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(A)-(B).

Second, Rule 23(b)(3) allows class certification if the questions class members share in common "predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Framed for situations in which 'class-action treatment is

---

7.    Rule 23(b)(2) supports certification in cases where injunctive relief is sought. That is not the case here.

-13-

not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit 'may nevertheless be convenient and desirable.'"  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment).

Because of their different standards for notification and the ability of class members to opt out, *see* Fed. R. Civ. P. 23(c), courts typically prefer to certify classes under Rule 23(b)(1) or 23(b)(2), the so-called "mandatory" types of class actions, as opposed to Rule 23(b)(3).  *See Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir. 1977) ("[W]hen a class action may be certified under either (b)(1) or (b)(3), the former should be chosen when to do so will avoid the inconsistent adjudication or compromise of class interests that might otherwise occur.").  However, classes are certified under Rule 23(b)(1) in fewer circumstances.

### 1. 23(b)(1): Risk of Inconsistent Outcomes Prejudicial Either to Non-Movant or to Potential Class Members

It is entirely conceivable that if I were to deny class certification in this matter, other plaintiffs would seek a separate adjudication of the same claim raised by Lemire, that Wolpoff violated federal law by violating state law.  There is already precedent in this judicial district to suggest that those adjudications might reach inconsistent outcomes.[8]

This inconsistency alone, however, does not appear sufficient to certify a class under Rule 23(b)(1)(A), because that section is clearly geared toward cases seeking injunctive or declaratory relief, *see Abramovitz v. Ahern*, 96 F.R.D. 208, 215 (D. Conn. 1982); *Petrolito v.*

---

8.    *See* discussion of *Gaetano* and *Goins*, in Section I., *supra*.  Under the logic in *Gaetano*, virtually any collection activity by Wolpoff done in Connecticut but contrary to Connecticut law would be a violation of the FDCPA; under the logic in *Goins*, Wolpoff's actions would require a case-by-case determination based on the content of the letters to consumers.

*Arrow Fin. Servs., LLC*, 221 F.R.D. 303, 313 (D. Conn. 2004), and such relief is not sought in this case. *See* Compl. ¶ 20.

With respect to Rule 23(b)(1)(B), it is unusual for courts to certify a class under that provision in a case that primarily seeks money damages, unless the damages are being sought from a so-called "limited fund."[9] Specifically, a plaintiff seeking certification under 23(b)(1)(B) must show that the defendant may be liable for more money than it has funds available. As plaintiff points out in her supplemental brief, she "has not and cannot make such a showing." Pl.'s Supp. Mem. [doc. #46] at 2.

That position, however, is somewhat disingenuous, given Wolpoff's claim that its current net worth is negative.[10] That alone surely suggests that there is a "limited fund" from which Lemire's classmates could draw their monetary relief. But Lemire naturally seeks minimize the importance of Wolpoff's negative net worth, since that fact suggests less recovery for the plaintiff class, and it also feeds into Wolpoff's argument against class certification under Rule 23(b)(3).[11]

This case thus presents an equally difficult scenario for Wolpoff, which trumpets its negative net worth in the Rule 23(b)(3) context. But in its supplemental brief addressing certifiability under Rule 23(b)(1), Wolpoff merely notes that such certification "typically" occurs

---

9.   Furthermore, precedent in this judicial district suggests that a certification under this provision might require a showing of a realistic risk of individual litigation. *See Ruland v. General Elec. Co.*, 94 F.R.D. 164, 165-66 (D. Conn. 1982). However, I doubt that such a showing would be difficult to make, especially in light of Wolpoff's complaint that such FDCPA suits have become a "cottage industry."

10.   Wolpoff stresses this fact as part of its argument against class certification under Rule 23(b)(3). *See* Section II.E.2.ii., *infra*.

11.   *See again* Section II.E.2.ii., *infra*.

in "limited fund" situations, and then fails to mention its negative-net-worth argument.  Def.'s Supp. Mem. [doc. #45] at 5.

Nevertheless, as is discussed more fully below, I am not persuaded by Wolpoff's arguments surrounding its negative net worth, so certification under Rule 23(b)(1)(B) is not appropriate at this juncture.  Likewise, I am persuaded by Lemire's argument that "there is no showing that the defendant lacks the resources to satisfy claims of any opt-outs," and I agree with Lemire that "[e]ven if certification of the class were to generate an unanticipated rush of opt-out claimants that would threaten to deplete the defendant's available funds . . . the Court would have the ability to address such a situation by re-certifying the class under Rule 23(b)(1) upon such a showing."  Pl.'s Supp. Mem. at 3.

## 2.      23(b)(3): Predominance of Commonality and Superiority of Class Action

Because certification under Rule 23(b)(1)(B) is not appropriate at this time, Lemire must demonstrate to the Court's satisfaction that the questions class members share in common "predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### i.      Predominance of a Class Action

Lemire has defined her class in such a way that every member of the putative class could allege the exact same theory of liability.  It is true that within the class, certain members may have been subject to practices that would provide them with additional grounds for alleging an FDCPA violation.  But because Lemire's theory, if valid, is present in all those cases as well, and because those members with stronger claims will have notice and an opportunity to opt-out of

this class, I find that class certification would be proper in this case.  In a very similar case in this judicial district alleging common FDCPA violations, Judge Arterton found the predominance factor easily satisfied.

> In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class.  Indeed, when determining whether common questions predominate courts focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.

*Macarz*, 193 F.R.D. at 54 (citations, brackets, and internal quotation marks omitted).

Unlike *Macarz*, the putative class members in this case have not all received an identical communication from the debt collector.  But the communications they did receive do share one common element of potential liability, at the very least.  Since "the liability issue is common to the class," I too find the predominance factor to be satisfied.

Besides, Wolpoff's opposition does not raise a serious argument against the *predominance* of the common claims in this action.  Instead, it argues against the *superiority* of a class action, arguing that members of the putative class would be limited to recovering less money as a class than they could recover in individual lawsuits.  Def.'s Mem. at 10-12.

### ii.    Superiority of a Class Action: Wolpoff's Negative Net Worth

Wolpoff's final argument against certification has a paternalistic quality to it, since it ostensibly seeks to protect individual class members.  Essentially, Wolpoff wants the Court to protect the right of such claimants to collect *more money* from Wolpoff.

In arguing for the inferiority of a class action in this case, Wolpoff points to the plain language of the FDCPA:

> Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of —
>
>> (1) any actual damage sustained by such person as a result of such failure;
>>
>> (2)     (A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or
>>
>> (B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; . . . .

15 U.S.C. § 1692k(a).

Wolpoff argues from this language that "it is clear that a class action, in the present case, is not a superior method of adjudication because Defendant's negative net worth would result in a zero recovery for class members." Def.'s Mem. at 2. "This is a manifestly inferior result when compared with an individual's potential recovery of $1,000 statutory damages under the FDCPA, irrespective of the Defendant's net worth." *Id.* at 4.

As a preliminary matter, this Court agrees entirely with Judge Arterton's conclusion in *Macarz*, in which the defendant similarly "feign[ed] concern for the putative class members," 193 F.R.D. at 54, and raised an argument almost identical to the one here:[12]

> First, under Rule 23(c)(2)(A), members of class actions maintained under 23(b)(3) who determine that their interests are better served by an individual action, and provide timely notice of this election

---

12.    In *Macarz*, the defendant argued that class members would recover "less than $50," 193 F.R.D. at 54, while Wolpoff alleges here that "there will be <u>no</u> recovery for the class members, even if liability is established." Def.'s Mem. at 11.

to the Court, will be excluded from the class. This "opt out" provision is designed to ensure that even in a class action that meets all the prerequisites of Rule 23, "the individual interest is respected."

Further, the notion that individual plaintiffs may recover higher damages if they were to pursue their own claims is implicit in the very idea of a class action, and is part of the balance that is struck in Rule 23 of providing a vehicle for the aggregation of small claims while still seeking to protect those individual claimants. The possibility that putative class members would be entitled to greater recovery should they pursue claims on their own arises in every class action, but it not grounds for denying class certification, if the other criteria are met.

193 F.R.D. at 55 (citations omitted).

Wolpoff has submitted, under seal, a financial audit that purports to show a negative net worth for that company. *See* Def.'s Motion to Seal Financial Records ex. A [doc. #39] (redacted version of report). It also argues strenuously in a Sur-Reply, [doc. #38, refiled as doc. #43], that Lemire received notice of the auditor's report at least two weeks prior to her motion for class certification, and that she "failed to conduct further discovery and accepted the certified financial statement as a sufficient and accurate response to the questions posed [during discovery related to class certification]." *Id.* at 3. In essence, Wolpoff argues that Lemire cannot contest the issue of the firm's negative valuation when she failed to pursue that question during discovery.

Lemire, for her part, questions the probative value of the auditor's report, and argues that "Wolpoff has failed to establish its negative net worth, which is very much under contention." Pl.'s Reply Mem. at 7. She argues that Wolpoff failed to divulge "other information concerning its finances . . . even though this information was sought in written discovery and not objected to." *Id.* at 8. And Lemire represents that upon certification, "the parties will engage in further discovery on this damages-related issue . . . ." *Id.*

While I am not convinced that this is purely a "damages-related issue," I am nevertheless convinced that certification is appropriate in this case, because even if Wolpoff's net worth turns out to be negative, a class action will *still* be superior to individual litigation. That is because I am convinced, like Judge Arterton in *Macarz*, that the interests of individual litigants in a potential recovery are preserved by the opt-out procedures that will be observed, and I am not convinced that the auditor's statement is the final word on the net worth of Wolpoff.[13] The Court will entertain motions for further discovery on this issue as needed.

### iii.    Other Considerations

The text of Rule 23(b)(3) also directs the Court to several "matters pertinent to these findings,"[14] including the interest that individual litigants would have in controlling their separate actions, the extent of any already-existing litigation, the desirability of concentrating claims in this particular forum, and the difficulties associated with class actions.

The parties have not briefed any further arguments surrounding those factors, and based upon their papers, I find that that these conditions are met. The interest of litigants in controlling separate actions is preserved by the opt-out procedures; there is no evidence of any existing litigation on the particular question of Wolpoff's liability in Connecticut; this forum is ideal since Lemire's argument is based on the state law here; and the difficulties associated with class actions will be modest, because both parties are demonstrably familiar with the proper prosecution and defense of class action litigation.

---

13.    The handful of cases cited by Wolpoff, Def.'s Mem. at 11, do not compel another result. The only case I find compelling is *Kohlenbrener v. Dickinson*, 1996 WL 131736, *2 (N.D. Ill. 1996), where the court held that proving superiority is the plaintiff's burden. That may be so, but the burden is in proving *superiority*, not *positive net worth*. Superiority is what I find to be shown here.

14.    The full text of those "matters" is already reproduced *supra* at the beginning of Part II.

**III.    Conclusion**

For the foregoing reasons, Lemire's motion for class certification is GRANTED.  The Court will entertain motions for further discovery related to Wolpoff's assets and net worth if requested by the parties.

It is SO ORDERED.

Dated: New Haven, Connecticut

March 31, 2009

_____/s/ Charles S. Haight, Jr._____
Charles S. Haight, Jr.
Senior United States District Judge